Filed 9/29/14  P. v. Tejan CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ISSA MOHAMED TEJAN,<br><br>    Defendant and Appellant. | D065267<br><br><br><br>(Super. Ct. No. RIF144082 MF,<br>   RIF143745, RIF145729,<br>   RIF146329, RIF153603) |

APPEAL from a judgment of the Superior Court of Riverside County, Gary B. Tranbarger, Judge.  Affirmed.

Lauren Eskenazi, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton, Heather M. Clark and Lynne McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

A Riverside County jury convicted Issa Mohamed Tejan of receipt of stolen property on June 9, 2008 (count 2:  Pen. Code,[1] § 496, subd. (a))(3CT 788, 731:3-10)!; first degree burglary on February 8, 2011 (count 7:  § 459); first degree burglary on August 3, 2009 (count 9:  § 459); and three counts of active participation in a criminal street gang (Edgemont/Dorner Blocc (hereafter Edgemont Dorner Blocc)) on June 9, 2008, February 8, 2011, and August 3, 2009 (counts 5, 8, & 10, respectively:  § 186.22, subd. (a) (hereafter section 186.22(a))).  The jury also found to be true enhancement allegations that Tejan committed the offenses charged in counts 2 and 7 (receipt of stolen property on June 9, 2008, and first degree burglary on February 8, 2011, respectively) for the benefit of a criminal street gang (§ 186.22, subd. (b) (hereafter section 186.22(b))).

In a bifurcated proceeding, the court found true allegations that Tejan committed counts 8 (active participation in a criminal street gang on February 8, 2011) and 10 (active participation in a criminal street gang on August 3, 2009) while on bail within the meaning of section 12022.1.  The court sentenced Tejan in this case to a total term of 14 years in state prison.

*Contentions*

On appeal, Tejan contends his conviction of count 6 (attempted burglary on September 11, 2008) must be reversed because the court prejudicially erred in failing to sua sponte instruct the jury that Terrion Engram was an accomplice as a matter of law and that his testimony must be viewed with caution and independently corroborated.

---

[1]     Undesignated statutory references will be to the Penal Code.

Tejan also contends his convictions of three counts of active participation in a criminal street gang (counts 5, 8, & 10), and the jury's true findings on the enhancement allegations that he committed counts 2 and 7 for the benefit of a criminal street gang, all must be reversed because (1) the prosecution's theory of the case was that Tejan belonged to the Edgemont Dorner Blocc gang, and (2) this theory was "legally insufficient" within the meaning of *People v. Guiton* (1993) 4 Cal.4th 1116 (*Guiton*) because Edgemont Dorner Blocc "does not meet the legal definition of a criminal street gang" as a matter of law under *People v. Williams* (2008) 167 Cal.App.4th 983.

Last, Tejan contends all of the gang convictions and enhancements must be reversed because the introduction of hearsay "basis evidence" through the testimony of the prosecution's gang expert, who testified he relied on it, prejudicially violated his Sixth Amendment right to confront witnesses. All of these contentions are unavailing. Accordingly, we affirm the judgment.

## FACTUAL BACKGROUND

A. *Receipt of Stolen Property on June 9, 2008* (*Count 2*: *Bostrom Residence*)

At some time before midnight on June 8, 2008, several individuals broke into the home of Mark Bostrom and his family in Moreno Valley. They ransacked the house, leaving cabinet doors open and drawers, linens, papers, clothing, toys, and furniture scattered on the floor throughout the house. Bostrom testified they stole a TV, DVD players and DVD's, commemorative law enforcement badges, and clothing with law enforcement insignia. They also stole foreign money, including a Mexican paper dollar and other money that had been scorched in an apartment fire; his wife's jewelry, most of

3

which was gold, including a cross necklace that had belonged to her mother, earrings, and tennis bracelets; a lot of her clothes and shoes; his Bulova, Seiko, and Relic watches; and some of his rings, including class rings. The video showed two male perpetrators. One of the investigating officers who studied the surveillance video testified he had "a good feeling" that one of the suspects shown in the video was Devaun Mosely.

Early the next morning, Tejan sold for $2,000 several pieces of the stolen jewelry to a pawnbroker in Moreno Valley. As required by California law, the pawnbroker created a receipt of the items he purchased, recorded Tejan's name and driver's license, took his fingerprint, had him sign the receipt, and then sent the receipt to the police department.

At around 3:40 that afternoon, officers stopped Tejan as he was driving a grey, four-door Honda sedan. The car had tinted windows and traffic collision damage to the front end, and it was missing a hubcap. Three others were in the car, including Devaun Mosely. Mark Bostrom's Bulova, Seiko, and Relic watches were found in the car. A bracelet, a necklace, and rings were also found in the car. Officers patted Tejan down and found several pieces of jewelry and a small container with marijuana. Tejan had the stolen gold necklace with a cross, and he was carrying two bills of Mexican currency. Devaun Mosely's fingerprints were found in multiple locations at the scene of the burglary.

B. *Attempted Burglary on September 11, 2008* (*Count 6*: *Leon Residence*)

On September 11, 2008, Joseph Sass lived on a cul-de-sac two doors away from Dennis Leon's home in Moreno Valley. At around 11:00 a.m. that day, Sass saw a red

4

car with three men inside pull up and park across the street from his house. He watched as two or three men, one carrying a black backpack, got out of the car and walked toward his neighbor's door. Sass testified he became suspicious because the men furtively looked around to see if anyone was watching them. Sass lost sight of the men as they got to the corner of the Leon residence garage where they could hop the fence into the backyard.

Sass called 911 within three or four minutes after the car pulled up his street; described the car, which was still parked on the street; and reported a few numbers from the license plate on that car. Sass reported that the first number was a "5" and the last two numbers were "55." The men returned to the car and left about four or five minutes after they arrived.

Within a few minutes of the report of a burglary in progress, officers spotted a car fitting the description that Sass had provided. The license plate number of the car was 5SDH955. Terrion Engram was driving the car, Joseph Hill was in the front passenger seat, and Tejan was in the back seat.

As officers followed the car, Tejan suddenly popped up in the back seat. They stopped the car, conducted a search, and found a backpack. Sass testified he gave a description of the suspects to the police, officers drove him to the car, and he identified one or two of the men he saw at the Leon residence. He also testified he identified the car and the backpack.

5

Deputy Sheriff Lionel Murphy testified that a shoe print taken from the top of a storage container outside the residence was consistent with the tread on the bottom of Joseph Hill's Nike shoes.

C. *First Degree Burglary on August 3, 2009* (*Count 9*: *Merriweather residence*)

On or about August 3, 2009, Eva Merriweather's home in Moreno Valley was burglarized while she and her nephew, who lived with her, were out of town. When they returned on August 4, they found that Merriweather's 46-inch television set had been stolen. Her nephew called the police and reported the burglary. Tejan's palm print was found at the point of entry—a partially-opened bedroom window that appeared to have been pried open.

D. *First Degree Burglary on February 8, 2011* (*Count 7*: *Ruiz Residence*)

On February 8, 2011, Deputy Sheriff Patrick Mushinskie responded to a report of a burglary in progress at the apartment of Ricardo Ruiz and his family in Moreno Valley. As Deputy Mushinskie approached the apartment complex, he saw a Black male, whom he later identified as Chris George, holding a 32-inch television walking towards him. When Deputy Mushinskie identified himself as a police officer, George turned around, threw the television into the bushes, ran towards a block wall, and jumped over it. Deputy Mushinskie broadcast George's location on the police radio, and officers arrested him.

Deputy Mushinskie turned towards the apartment complex and saw Tejan and another Black male running out of the building. Tejan was wearing dark jeans with a "wild" design on the back. After unsuccessfully trying to pursue Tejan and the third

suspect, Deputy Mushinskie broadcast a description of the suspects and their location on the police radio.

Soon thereafter, a witness called the police to report a stranger was hiding in her bathroom. Officer William Mooney testified that he responded to the call and found Tejan lying in the bathtub behind the shower curtain. Ruiz testified that jewelry, televisions, and other personal property were stolen from his apartment.

DISCUSSION

I. *FAILURE TO GIVE ACCOMPLICE INSTRUCTIONS* (*COUNT 6*)

Tejan first contends his conviction of count 6 (attempted burglary on September 11, 2008) must be reversed because the court prejudicially erred in failing sua sponte to instruct the jury that Terrion Engram was an accomplice as a matter of law, and that his testimony must be viewed with caution and independently corroborated. This contention is unavailing.

A. *Background*: *Engram's Police Interview and His Inconsistent Trial Testimony*

On September 11, 2008, as Engram was driving a red sedan, a police officer stopped him in connection with a report of an attempted burglary at a residence in Morena Valley. Deputy Sheriff Chris Brown, who assisted the officer that made the stop, testified that Engram was driving the car, Joseph Hill was in the front passenger seat, and Tejan was in the back seat. Deputy Brown also testified that a backpack was found in the car.

After Engram was transported to the police station, Deputy Brown assisted in interviewing him. Deputy Brown testified that Engram talked about the attempted

7

burglary. An audio recording of the interview was played for the jury, who were given copies of the transcript.

During the interview, Engram made statements that tended to incriminate Tejan. Engram said that Tejan had called him on his cell phone and asked him to take him (Tejan) and Joseph Hill to "go do something." Engram said that after he picked up Tejan and Hill, Tejan told him they were going to "hit" a girl's house. After they arrived at the house, Engram watched Tejan and Hill knock on the door, but no one answered. Engram also said he did not see Tejan and Hill "hop the gate." They came back to the car, and Tejan said he thought that a man across the street had seen him. Tejan told Engram, "Get out of here."

Engram was granted immunity and testified at trial. However, he told a different story on the stand that was favorable to Tejan. Engram testified he never told the police that he, Tejan, and Hill were going to a girl's house to burglarize it. He testified that Tejan and Hill told him they were going to the house of a girl who owed them money, and they "didn't say they were going to literally break in no one's [*sic*] house." Engram denied he ever had any knowledge of a burglary.

Engram also testified that when he drove Tejan and Hill to the house, he stayed in the car and watched Tejan and Hill walk to the front door and knock. Engram indicated he stopped paying attention at that point because he was on the phone, Tejan and Hill walked back to the car a couple of minutes later and got back in, and they then left. Engram testified he did not recall telling the police that Tejan told him the neighbor saw him, and he also did not recall telling the police that Tejan told him to "get out of here."

8

Engram then testified that Tejan did not say, "Get out of here," and he did not say he thought someone had seen him. Engram also testified that Tejan was his "friend on the streets."

Defense counsel did not raise the issue of accomplice testimony with the court before Engram testified at trial. Defense counsel also did not request that the jury be instructed on accomplice testimony under CALCRIM Nos. 334 or 359 and did not object to the proposed jury instructions on accomplice testimony grounds.

B. *Section 1111* (*Accomplice Testimony*)

Section 1111 prohibits a conviction based "upon the testimony of an accomplice unless it be corroborated by such other evidence as shall *tend to connect the defendant with the commission of the offense*." (Italics added; see *People v. McDermott* (2002) 28 Cal.4th 946, 985-986 ["A conviction can be based on an accomplice's testimony only if other evidence tending to connect the defendant with the commission of the offense corroborates that testimony."].)

"An accomplice is 'one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' (§ 1111.) To be so chargeable, the witness must be a principal under section 31. That section defines principals as '[a]ll persons concerned in the commission of a crime, whether . . . they directly commit the act constituting the offense, or aid and abet in its commission . . . .'" (*People v. Avila* (2006) 38 Cal.4th 491, 564 (*Avila*).)

9

"Whether a person is an accomplice within the meaning of section 1111 is a factual question for the jury to determine . . . unless '"there is no dispute as to either the facts or the inferences to be drawn therefrom."'" (*Avila*, *supra*, 38 Cal.4th at p. 564.) "Thus, a trial court can determine 'as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are "clear and undisputed."'" (*Id.* at p. 565.)

C. *Analysis*

Asserting that Engram was chargeable as an accomplice to the attempted residential burglary charged in count 6, Tejan contends the court prejudicially erred by not sua sponte instructing the jury that Engram's testimony required independent corroboration under section 1111 and should be viewed with caution. We need not decide whether the court committed instructional error because we conclude any error was harmless.

In *Avila* the California Supreme Court explained that "[a] trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is 'sufficient corroborating evidence in the record.'" (*Avila*, *supra*, 38 Cal.4th at p. 562.) *Avila* explained that, "[t]o corroborate the testimony of an accomplice, the prosecution must present 'independent evidence' . . . without aid or assistance from the accomplice's testimony." (*Id*. at pp. 562-563.) "The corroboration required of accomplice testimony . . . need only connect the defendant to the crime sufficiently that we may conclude the jury reasonably could have been satisfied that the accomplice was telling the truth." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 185-186.) "[T]he corroborating evidence may

10

be circumstantial, of little weight by itself, and related merely to *one part* of the accomplice's testimony." (*Id.* at p. 186, italics added; see also *People v. Abilez* (2007) 41 Cal.4th 472, 505 [such corroborative evidence may be slight or entirely circumstantial and entitled to little consideration when standing alone, and need not by itself establish every element of the crime].)

Here, we assume without deciding that Engram was chargeable as an accomplice to the attempted burglary of the residence charged in count 6, and that the court committed the claimed instructional error. We conclude, however, that any such assumed error was harmless because independent corroborating evidence "connect[s] [Tejan] to the crime sufficiently that we may conclude the jury reasonably could have been satisfied that [Engram] was telling the truth" (*People v. Letner and Tobin*, *supra*, 50 Cal.4th at pp. 185-186) when he made his statements inculpating Tejan during his (Engram's) police interview.

Specifically, as noted, Engram told the police that when Tejan and Hill returned to the car that Engram was driving, Tejan told Engram to "[g]et out of here" because he thought a man across the street had seen him. Engram's statement, if credited by the jury, tends to connect Tejan to the commission of the attempted burglary charged in count 6 by supporting a reasonable inference that Tejan's remark to Engram—that they should "get out of [there]" because a man across the street had seen him—reflected Tejan's consciousness of guilt.

The evidence of Engram's foregoing statement to the police is independently and sufficiently corroborated by the testimony of Joseph Sass. Sass testified that on the day

11

in question he lived on a cul-de-sac two doors away from the Leon residence on Laurel Court. He also testified that he saw a red car with three men inside pull up and park across the street from his house. Sass stated he saw two or three men, one carrying a black backpack, get out of the car and walk towards his neighbor's door. Sass also testified he became suspicious when the men furtively looked around to see if anyone was watching them, and when they then walked out of sight to a place where they could hop the fence into the backyard. Sass's testimony corroborates Engram's statement to the police because it independently shows that Sass was the man across the street who (as Tejan told Engram) had seen Tejan.

Ample additional circumstantial evidence corroborates Engram's statement to the police that, as he was driving Tejan and Hill to the Laurel Court residence, Tejan told him they were going to "hit"—that is, burglarize—a girl's house. Tejan disregards circumstantial evidence showing that Tejan was hiding in the back seat of the car after Engram, Tejan, and Hill drove away from the crime scene, again showing Tejan's consciousness of guilt. Specifically, Sergeant Reichmann of the Riverside County Sheriff's Department testified that as he was following the car, which Sass had described when he called 911, he saw that the driver (Engram) was starting to look up into the mirror, and all of a sudden a man (Tejan) who had been lying down in the back seat "suddenly popped up."

Tejan also disregards Sass's testimony that one of the suspicious men he saw across the street was carrying a black backpack, Deputy Brown's testimony that a

12

backpack was found in the getaway car, and Sass's testimony that he identified both the car and the backpack after the police stopped the car.

Tejan also disregards Deputy Sheriff Murphy's testimony that a shoe print taken from the top of a storage container located inside the fence at the residence was consistent with the tread on the bottom of Hill's Nike shoes. As shown by Deputy Brown's testimony, Hill was found in the getaway car with Tejan and Engram.

In sum, the foregoing evidence independently corroborates Engram's testimony because it tends to connect Tejan to the commission of the attempted burglary charged in count 6. Accordingly, we affirm Tejan's count 6 conviction.

## II. *CLAIM OF "LEGALLY INSUFFICIENT" GANG EVIDENCE*

Tejan also claims his convictions of three counts of active participation in a criminal street gang (counts 5, 8, & 10), and the jury's true findings on the enhancement allegations that he committed counts 2 and 7 for the benefit of a criminal street gang, all must be reversed. In support of this claim, Tejan asserts that (1) the prosecution's theory of the case was that Tejan belonged to the Edgemont Dorner Blocc gang, which the prosecution's gang expert testified was formed when the Edgemont Criminal, Dorner Blocc, and YPC gangs merged; (2) this theory was "legally insufficient" within the meaning of *Guiton, supra,* 4 Cal.4th 1116 because Edgemont Dorner Blocc "does not meet the legal definition of a criminal street gang" under *People v. Williams*, *supra*, 167 Cal.App.4th 983; and, thus (3) the jury may have returned the verdicts based on a "legally incorrect theory of the case" because "there was insufficient evidence to support a finding that [the Edgemont Criminal, Dorner Blocc, and YPC] gangs operated as one or that they

13

merged into one gang."  We reject Tejan's claim that the evidence is legally insufficient to support a finding that the Edgemont Dorner Blocc gang is a criminal street gang.

A.  *Background*:  *Gang Evidence*

Detective Lance Colmer of the Riverside County Sheriff's Department's Moreno Valley Gang Unit testified for the prosecution as an expert on Moreno Valley gangs, including the Edgemont Dorner Blocc gang.  Detective Colmer opined that Edgemont Dorner Blocc is a criminal street gang whose primary activities are drug sales, residential and school burglaries, robberies, and thefts;[2] and that Tejan is a member of that gang.

Regarding the basis for his opinions, Detective Colmer explained there are several active Black criminal street gangs in Moreno Valley:  Edgemont Criminal, Dorner Blocc, Young International Paper Chasers (YPC), and Sex Cash.  He testified that when Sex Cash developed a membership base that was larger than that of the other gangs, "Edgemont [Criminal], Dorner Blocc and YPC . . . merged their membership into one large gang" and "have been operating as one large gang"─the Edgemont Dorner Blocc gang─"in order to combat Sex Cash."  He also testified that Edgemont Dorner Blocc is "[t]he common name now" for the merged Edgemont Criminal, Dorner Blocc, and YPC gangs; he has "arrested many, many members of this gang"; and the gang members use the proceeds of their crimes "to either finance themselves or to gain access to firearms."

---

2      Tejan acknowledges that Detective Colmer "testified to approximately seven predicate offenses, other than the underlying crimes in this case, to prove the primary activities of Edgemont Dorner Blocc gang."

14

Detective Colmer also testified he is familiar with Tejan because he personally had contacted him many times in the "turf area" of the Edgemont Dorner Blocc gang, and he had served a search warrant at Tejan's residence where he collected items in Tejan's room indicating his membership in the gang, such as clothing and letters with symbols of the gang. Detective Colmer also explained that he had spoken to members of the Edgemont Dorner Blocc gang. He further testified he had learned from other members of the gang and from letters he found in Tejan's room that Tejan's gang moniker is "Baby Crai-G." Detective Colmer also testified that Tejan is shown in photographs (marked as exhibits Nos. 102, 104, and 104) with other individuals that he (Detective Colmer) believes are members of the Edgemont Dorner Blocc gang, and Detective Colmer recognized the gang hand signs the individuals are displaying in those photographs.

B. *Applicable Legal Principles*

1. *Guiton*

In *Guiton*, *supra*, 4 Cal.4th 1116, the California Supreme Court explained that although the sufficiency of the evidence is "always a legal question," there are "two types of cases involving insufficient evidence: (a) those in which 'a particular theory of conviction . . . is contrary to law,' or, phrased slightly differently, cases involving a '*legally* inadequate theory'; and (b) those in which the jury has merely been 'left the option of relying upon a *factually* inadequate theory,' or, also phrased slightly differently, cases in which there was an 'insufficiency of proof.'" (*Id*. at p. 1128, quoting *Griffin v. United States* (1991) 502 U.S. 46.)

15

The *Guiton* court also explained that "[i]f the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground. But if the inadequacy [of proof] is *legal*, not merely factual, that is, *when the facts do not state a crime under the applicable statute*," reversal is required "absent a basis in the record to find that the verdict was actually based on a valid ground." (*Guiton*, *supra*, 4 Cal.4th at p. 1129, italics added.)

2. *Standard of review*

When assessing a challenge to the sufficiency of the evidence supporting a conviction, we apply the substantial evidence standard of review, under which we view the evidence "in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *People v. Jones* (1990) 51 Cal.3d 294, 314.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

16

C. *Analysis*

As noted, Tejan's claim of error is premised on his contention that the evidence supporting both his convictions of active participation in a criminal street gang (§ 186.22(a); counts 5, 8, & 10) and the jury's true findings on the gang enhancement allegations (§ 186.22(b)(1); counts 2 & 7) is "legally insufficient" to support a finding that the Edgemont Dorner Blocc gang is a criminal street gang. Specifically, he asserts these convictions and enhancements must be reversed because, under *Guiton*, "the jury was not permitted to convict [him] of gang related crimes and enhancements if it found that the burglaries were committed to benefit [the] Edgemont Dorner Blocc gang because, as a matter of law, there was *insufficient evidence* to support a finding that [the Edgemont and Dorner Blocc] gangs operated as one or that they merged into one gang." (Italics added.) We reject these contentions.

For purposes of sections 186.22(a) and 186.22(b), as the jury was properly instructed in this case, the term "criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated] criminal acts . . . , having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

Here, the expert testimony of the prosecution's Moreno Valley gang expert, Detective Colmer, is sufficient to support a finding that the Edgemont Dorner Blocc gang is a criminal street gang within the meaning of section 186.22, subdivisions (a), (b), and

17

(f); and, thus, it is sufficient to support both the convictions of active participation in a criminal street gang and the gang enhancements that Tejan challenges.  As discussed more fully, *ante*, Detective Colmer testified to his expert opinion that Edgemont Dorner Blocc is the common name of a criminal street gang whose primary activities are drug sales, residential and school burglaries, robberies, and thefts.  He also testified that Edgemont Dorner Blocc was formed in 2003 when the Edgemont Criminal, Dorner Blocc, and YPC gangs "merged their membership into one large gang," and the smaller gangs "have been operating as one large gang"─the Edgemont Dorner Blocc gang─in order to "combat" a third gang known as Sex Cash.  Detective Colmer further testified to the "turf area" of the Edgemont Dorner Blocc gang, and the fact that the gang members use the proceeds of their primary gang-related criminal activities "to either finance themselves or to gain access to firearms."

This expert testimony is legally sufficient to show Edgemont Dorner Blocc is a criminal street gang (see § 186.22, subd. (d)), and the *weight* to be given to that testimony was a matter for the jury to decide.  As noted, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses.  (*People v. Ochoa*, *supra*, 6 Cal.4th at p. 1206; *People v. Jones*, *supra*, 51 Cal.3d at p. 314.)

Tejan's reliance on *People v. Williams*, *supra*, 167 Cal.App.4th 983, for the proposition that the Edgemont Dorner Blocc gang "does not meet the legal definition of a criminal street gang," is unavailing.  In that case, the Count of Appeal explained that "something more than a shared ideology or philosophy, or a name that contains the same word, must be shown before multiple units can be treated as a whole when determining

whether a group constitutes a criminal street gang. Instead, *some sort of collaborative activities* or collective organizational structure must be inferable from the evidence, so that the various groups reasonably can be viewed as parts of the same overall organization." (*Id*. at p. 988, italics added.) Here, Detective Colmer's expert testimony that the smaller gangs "have been operating as one large gang"—the Edgemont Dorner Blocc gang—in order to "combat" a third gang known as Sex Cash, provided substantial evidence that the smaller gangs have been engaging in "some sort of collaborative activities" (*ibid*.). Again, the weight to be given to this evidence was a matter for the jury to decide.

Tejan's argument that "Edgemont Criminals, Dorner Blocc, and [YPC] shared no collective organizational structure," is also unavailing. In *People v. Ortega* (2006) 145 Cal.App.4th 1344, 1357, the Court of Appeal explained that "'gangs are not public and open organizations or associations like the YMCA or State Bar Association, which have a clearly defined and ascertainable membership. Rather, gangs are more secretive, loosely defined associations of people, whose involvement runs the gamut from "wannabes" to leaders.'" Here, in light of the foregoing nature of gang structures and Detective Colmer's testimony showing the apparent willingness of the members of the smaller gangs to work collaboratively for the common purpose of "combat[ting]" the rival Sex Cash gang, the lack of evidence of what Tejan calls a " collective organizational structure" does not render Detective Colmer's expert testimony "legally insufficient."

For all of the foregoing reasons, we reject Tejan's claim that the evidence is legally insufficient to support a finding that the Edgemont Dorner Blocc gang is a criminal street gang.

### III. *CLAIMED VIOLATION OF THE CONFRONTATION CLAUSE*

Last, relying principally on *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221], Tejan contends that all of his gang convictions and enhancements must be reversed because the introduction of hearsay "basis evidence" through the testimony of Detective Colmer, the prosecution's gang expert who testified he relied on it, prejudicially violated Tejan's Sixth Amendment right to confront witnesses. For reasons we shall explain, this contention is unavailing.

### A. *Background*

As discussed, *ante*, Detective Colmer testified as the prosecution's expert on Moreno Valley gangs, including the Edgemont Dorner Blocc gang. When the prosecutor asked him whether all the members live in the territory of the gang, the defense raised a "[f]oundation" objection. The court overruled that objection, but instructed the jury as follows that Detective Colmer's responses would be admitted not "for the truth of actually what is said," but to show the "basis" of his expert opinions:

> "Ladies and gentlemen, I want to make a general comment to keep in mind this testimony. This witness is not here to give you firsthand testimony of what he's seen and heard. He's here to give you opinions about various aspects having to do with gangs and this particular gang.
>
> "From time to time he will tell you that he's talked to people and seen things. This is admitted not to be as evidence about each of these things itself. *This is admitted so that you might know and*

20

*understand and evaluate the basis for his opinions so that you might come to a conclusion as you will for every witness or every expert who gives an opinion whether or not the opinion has a basis that is . . . such that you want to choose to rely on the opinion or not rely on the opinion.*

"So I'm going to overrule the objection, but I want to make sure you know this − *everything that comes in here is not coming in for the truth of actually what is said. It's coming in here so that you might have a basis on which to evaluate the strength or weaknesses of the opinion that he is giving*."  (Italics added.)

The prosecutor then asked Detective Colmer, "And what are the primary activities of the Edgemont Dorner Blocc gang?"  Defense counsel did not object, and Detective Colmer responded, "I would say the primary activities are drug sales and burglaries, robberies, and thefts."

The prosecutor then asked Detective Colmer whether he was familiar with Tejan. Detective Colmer answered, without an objection by the defense, that he had contacted Tejan "many times in the turf area of the gang," he had reviewed crime reports indicating Tejan had "committed crimes with other members of the gang," he had served a search warrant at Tejan's residence, and he had "collected items of what's called gang indicia or items which are indicative of his gang membership:  clothing and letters with symbols of the gang in his room."

Detective Colmer then stated he had spoken to "many members" of the gang. When he was about to testify regarding what the gang members had told him, defense counsel interjected, "Objection," without stating a specific ground for the objection.  The court overruled the objection, but again instructed the jury that Detective Colmer's

21

testimony about what was said to him was being admitted not for the truth of the statements, but to show the basis for his opinions:

> "Again, ladies and gentlemen, at this time he's about to say that he's received information from other people. Now, in a typical situation here in a courtroom, we don't allow that because that's known as hearsay. So you can't rely on the truth because whoever he's talking to isn't going to come to court and be questioned and evaluate the source of the information. So keep that in mind.
>
> "This is not coming in for the truth of whatever he says when he says [']I've learned from other people['] anything, but it's letting you know that he has opinions, and this is what he's basing his opinion on."

Responding to the prosecutor's earlier question about whether he was familiar with Tejan, Detective Colmer then stated he had "spoken to many people who are members of his gang." He explained that part of his job as a gang investigator is to "debrief and contact and interview every gang member [he] come[s] across and try to extract information from them," write down and catalog that information, and research gang activities and membership. Detective Colmer also testified he had "seized photographs of [Tejan] displaying gang hand signs during probation searches," and he had received "photographs off the internet, namely sites like MySpace and FaceBook where people often post photographs of themselves displaying their gang hand signs or posing with other gang members."

As Tejan discusses in detail in his opening brief, the "basis evidence" supporting Detective Colmer's expert opinion testimony regarding the primary criminal activities of the Edgemont Dorner Blocc gang and the predicate offenses the prosecution was required to prove under section 186.22, subdivisions (a), (b), and (f), included "Case Prints"

22

computer print-outs from various criminal cases filed in the Riverside County Superior Court that involved alleged gang members, as well as copies of guilty plea forms and other court records in some of those cases.

Relying on this "basis evidence," Detective Colmer opined that those cases were related to the Edgemont Dorner Blocc gang and the crimes were committed for the benefit of, in association with, or at the direction of a criminal street gang. The various case prints and guilty plea forms on which Detective Colmer based his expert opinions in part were admitted into evidence without a defense objection, but he did not discuss their contents during his testimony at trial.

B. *Applicable Legal Principles*

The confrontation clause of the Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.)

1. *Crawford*

In *Crawford v. Washington* (2004) 541 U.S. 36, 59 (*Crawford*), the United States Supreme Court held that the Sixth Amendment's confrontation clause prohibits the prosecution's use in criminal cases of out-of-court "[t]estimonial statements" of a witness who does not appear at trial unless (1) the witness is unavailable to testify, and (2) the defendant had a prior opportunity to cross-examine the witness.

Although the *Crawford* court did not set forth a comprehensive definition of what constitutes "testimonial" evidence, it elaborated to some degree by stating that the "core class of 'testimonial' statements" (*Crawford, supra,* 541 U.S. at p. 51) covered by the

23

confrontation clause includes (1) "'ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially'[ (2)] 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions'[; and (3)] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (*Crawford*, *supra*, 541 U.S. at pp. 51-52; *Melendez–Diaz v. Massachusetts* (2009) 557 U.S. 305, 309-310.)

    2. *Williams v. Illinois*

In 2012 the high federal court revisited this issue in *Williams v. Illinois*, *supra*, 132 S.Ct. 2221. At issue was testimony by the prosecution's expert witness—Illinois State Police forensic biologist Sandra Lambatos—that a DNA profile, which was produced by a Maryland laboratory based on semen found on the rape victim's vaginal swabs, matched a DNA profile produced by the Illinois State Police Laboratory based on a sample of the defendant's blood. (*Id*. at p. 2227.) The defendant claimed that Lambatos's testimony violated the confrontation clause as interpreted in *Crawford*. (*Williams v. Illinois,* at p. 2227.)

The plurality opinion in *Williams v. Illinois* was authored by Justice Alito with the concurrence of Chief Justice Roberts and Justices Kennedy and Breyer, and Justice Breyer explained in a separate concurring opinion why he joined Justice Alito's opinion "in full." (*Williams v. Illinois*, *supra*, 132 S.Ct. at p. 2252 (conc. opn. of Breyer, J.).)

The plurality concluded on two alternative grounds that Lambatos's expert testimony did not violate the Sixth Amendment's confrontation clause. First, the plurality reasoned that admission of Lambatos's testimony was constitutionally permissible because it was admitted not for its truth but for the limited purpose of explaining the basis of her independent conclusion, based on her expertise, that the defendant's DNA matched the DNA in the semen found on the vaginal swabs. (*Williams v. Illinois,* at p. 2228 (plur. opn. of Alito, J.).) Alternatively, the *Williams v. Illinois* plurality reasoned that "even if the [Maryland laboratory's report] had been admitted into evidence, there would have been no Confrontation Clause violation" (*ibid.*) because the report was prepared for the primary purpose of finding a dangerous rapist who was still at large, not "for the primary purpose of accusing a targeted individual." (*Williams v. Illinois*, at p. 2243] (plur. opn. of Alito, J.).)

In a separate concurring opinion, Justice Thomas agreed with the plurality's conclusion that Lambatos's expert testimony did not violate the Sixth Amendment's confrontation clause, but for a different reason: The Maryland laboratory's report on which Lambatos relied "lack[ed] the solemnity of an affidavit or deposition [because it was] neither a sworn nor a certified declaration of fact" (*Williams v. Illinois, supra,* 132 S.Ct. at p. 2256 (conc. opn. of Thomas J.)), and therefore was not "testimonial." (*Id.* at p. 2260] (conc. opn. of Thomas, J.).) Justice Thomas also concluded, however, that "statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose [because t]here is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's

25

opinion and disclosing that statement for its truth." (*Id*. at p. 2257.) Thus, he would further conclude that the statements in the Maryland laboratory's report "were introduced for their truth." (*Id*. at pp. 2258-2259.)

A dissenting opinion by Justice Kagan, which was signed by Justices Scalia, Ginsburg, and Sotomayor, disagreed with the reasoning of both the plurality and Justice Thomas, and concluded that Lambatos's expert opinion testimony—that the semen found on the rape victim's vaginal swabs contained the defendant's DNA—violated the defendant's Sixth Amendment right to confront the analysts who had prepared the Maryland laboratory's report on which Lambatos based her opinion. (*Williams v. Illinois*, *supra*, 132 S.Ct. at pp. 2264, 2267-2268 (dis. opn. of Kagan, J.).) Like Justice Thomas in his concurrence, the dissent rejected the *Williams* plurality's conclusion that Lambatos's testimony about the report was not admitted for the truth of the matters asserted in the report. (*Id*. at p. 2268 (dis. opn. of Kagan, J.) ["Lambatos's statements about [the Maryland laboratory's] report went to its truth."].) Also, like Justice Thomas's concurrence, the dissent rejected the plurality's alternative conclusion that the Maryland laboratory's report was not testimonial because it was primarily prepared not to accuse a targeted suspect but to catch an unidentified rapist still at large. (*Id*. at pp. 2272-2273 (dis. opn. of Kagan, J.).)

3. *People v. Dungo*

In *People v. Dungo* (2012) 55 Cal.4th 608 (*Dungo*), the California Supreme Court recently reviewed *Crawford*, *supra*, 541 U.S. 36, and its progeny—including *Williams v. Illinois*, *supra*, 132 S.Ct. 2221—and explained that "[a]lthough the high [federal] court

has not agreed on a definition of 'testimonial,' testimonial out-of-court statements have two critical components. First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to *a criminal prosecution*. The high court justices have not, however, agreed on what the statement's primary purpose must be." (*Dungo*, at p. 619, italics added.)

In our analysis, *post*, we will use the *Dungo* court's interpretation of *Crawford*, *supra*, 541 U.S. 36, and its progeny—including *Williams v. Illinois*, *supra*, 132 S.Ct. 2221.

C. *Analysis*

Tejan's principal contention is that the introduction of a "plethora of gang related hearsay basis evidence" through the testimony of the prosecution's gang expert, Detective Colmer, "to support his opinions that the Edgemont Dorner Blocc gang committed residential burglaries of homes and schools as their primary activity and that the crimes [Tejan] was charged with were committed in association with [that gang]" constituted federal constitutional error as it was never subjected to cross-examination as required by the Sixth Amendment's confrontation clause. As discussed, *ante*, this evidence included various Riverside County Superior Court "Case Prints," other court records pertaining to guilty pleas entered in some of those cases, and the gang research Detective Colmer had performed and the out-of-court statements from gang members he had collected and catalogued in the course of his work as a gang investigator. In a related contention, Tejan asserts that "under the dictates of [*Williams v. Illinois*, *supra*, 132 S.Ct. 2221, this

27

evidence was introduced for the truth of the matter asserted and, absent confrontation, violated the Sixth Amendment."  These contentions are unavailing.

1.  *Forfeiture*

Tejan did not raise in the trial court an objection that the admission of out-of-court statements violated his right under the Sixth Amendment to confront witnesses.  Thus, he has forfeited his claim of federal constitutional error under the Sixth Amendment's confrontation clause.  (See *People v. Redd* (2010) 48 Cal.4th 691, 730 [defendant forfeited confrontation clause claim by failing to raise it at trial]; accord, *People v. Tafoya* (2007) 42 Cal.4th 147, 166; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028, fn. 19.)

2.  *Merits*

Even if Tejan's confrontation clause claim had been preserved, it would fail.  For purposes of analysis, we assume without deciding that the challenged out-of-court "basis evidence" on which Detective Colmer based his expert opinions was admitted for the truth.  However, even if the prosecution introduced the out-of-court statements for their truth, admission of this evidence would not offend the Sixth Amendment right to confront adverse witnesses unless those statements are "testimonial" in nature.  (*Crawford*, *supra*, 541 U.S. at p. 59; *Dungo*, *supra*, 55 Cal.4th at p. 616.)

As already discussed, the California Supreme Court has explained that although the United States Supreme Court has not yet agreed on a definition of "testimonial," testimonial out-of-court statements have two critical components:  (1) the statement "must be made with some degree of formality or solemnity," and (2) the "primary

28

purpose" of the statement must "pertain[] in some fashion to *a criminal prosecution*." (*Dungo*, *supra*, 55 Cal.4th at p. 619, italics added.)

Here, as noted, Tejan primarily relies on various superior court "Case Prints," as well as other court records pertaining to guilty pleas entered in some of those cases, on which Detective Colmer based his expert opinions. A review of these records shows the "Case Prints" are court records that pertain to specific cases filed in the Riverside County Superior Court; provide the case number, the defendant's name, the charging information, and the court's records of the defendant's criminal history. They consist primarily of court minutes compiled in chronological order. Attached to some of the "Case Prints" are copies of related felony plea forms. We conclude that, as criminal investigation "pertain[ing] in some fashion to a criminal prosecution" (*Dungo*, *supra*, 55 Cal.4th at p. 619) was not the primary purpose for recording the information contained in these court records, which are simply official records of the court's proceedings, they cannot be considered testimonial for purposes of the Sixth Amendment's confrontation clause.

Tejan also apparently relies on Detective Colmer's "basis" testimony about gang research he had performed and out-of-court statements from gang members he had collected and catalogued in the course of his work as an investigator for the Moreno Valley police station's gang unit, where he had been assigned for the previous nine years. The out-of-court statements Detective Colmer described as constituting part of his education in criminal street gangs were not described as formalized statements or statements "pertain[ing] in some fashion to a criminal prosecution" (*Dungo*, *supra*, 55

Cal.4th at p. 619), and, therefore, without more, would not be testimonial even if they were recited by Detective Colmer at trial.

For all of the foregoing reasons, we affirm the judgment.


DISPOSITION

The judgment is affirmed.


NARES, Acting P. J.

WE CONCUR:


HALLER, J.


AARON, J.